FILED

2010 Dec-14  PM 01:50
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **SAMUEL BARNES, III,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-09-S-2556-NW** |
| | ) | |
| **HOWMEDICA OSTEONICS** | ) | |
| **CORPORATION, d/b/a** | ) | |
| **STRYKER CORPORATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Samuel Barnes, III, filed this action alleging that faults in a prosthetic hip replacement device designed, manufactured, and sold by defendant, Howmedica Osteonics Corporation, doing business as Stryker Corporation, injured him.[1] Plaintiff's complaint, originally filed in the Circuit Court of Lauderdale County, Alabama, asserted a series of common law claims based on that allegation.[2]  The case was removed to this court on the basis of the parties' complete diversity of citizenship and the requisite amount in controversy.[3]  *See* 28 U.S.C. §§ 1332(a)(1), 1441(a).  The case is presently before the court on defendant's motion for summary judgment as to

---

[1] *See* doc. no. 11, Ex. A (Complaint).  When referring to the complaint, the court will refer to this document number, rather than the notice of removal (doc. no. 1), for the sake of simplicity.

[2] *Id. passim*.

[3] Doc. no. 1, at 1.

all of plaintiff's claims.[4]  Upon consideration of the parties' pleadings, briefs, and evidentiary submissions, the court concludes that all of plaintiff's state law claims are preempted by federal law and, accordingly, that the motion for summary judgment is due to be granted.

## I.  LEGAL STANDARDS

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).[5] "[A] party may file a motion for summary judgment at any time until 30 days after the close of all discovery."  Fed. R. Civ. P. 56(b).  Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "'In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.'"  *Chapman v. AI Transport*, 229

---

[4] Doc. no. 11, at 1.

[5] Rule 56 was amended, effective December 1, 2010, in conjunction with a general revision of some of the Federal Rules of Civil Procedure.  The Advisory Committee was careful to note, however, that the changes "*will not affect continuing development of the decisional law* construing and applying these phrases." Adv. Comm. Notes to Fed. R. Civ. P. 56 (2010 Amends.) (emphasis supplied).  Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).   Inferences in favor of the non-moving party are not unqualified, however.   "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation."  *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983).   Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material to an issue affecting the outcome of the case*.   The relevant rules of substantive law dictate the materiality of a disputed fact.   A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis supplied).

*See also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

"Whether [federal law] preempts a state-law claim is a question of law," which properly may be decided on summary judgment.  *Bartholomew v. AGL Resources*, *Inc.*, 361 F.3d 1333, 1337 (11th Cir. 2004); *see also Riegel v. Medtronic, Inc.*, 552 U.S. 312, 330 (2008) (affirming determination that state law claims were preempted as a matter of law under Federal Rule of Civil Procedure 12(b)(6)); *Koutsouradis v.*

*Delta Air Lines, Inc.*, 427 F.3d 1339, 1343 (11th Cir. 2005) (affirming summary judgment granted on the basis of preemption).

> Article VI, cl. 2, of the Constitution provides that the laws of the United States "shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." Consistent with that command, [federal courts] have long recognized that state laws that conflict with federal law are "without effect." *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981).

*Altria Group, Inc. v. Good*, — U.S. —, 129 S. Ct. 538, 543 (U.S. 2008). "'[T]he purpose of Congress is the ultimate touchstone' in every pre-emption case." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quoting *Retail Clerks v. Schermerhorn*, 375 U.S. 96, 103 (1963)). "Congress may indicate pre-emptive intent through a statute's express language or through its structure and purpose." *Altria Group, Inc.*, — U.S. —, 129 S. Ct. at 543 (citing *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977)). While "federalism concerns" must inform determinations about the "scope of pre-emption" Congress intended, once it is determined that Congress intended to preempt a particular area of state law, that state law must yield. *Lohr*, 518 U.S. at 485-86.

## II.  SUMMARY OF THE RELEVANT FACTS[6]

---

[6] At the summary judgment stage, the court must "recount the facts in the light most favorable to . . . the non-moving party." *Wood v. Kesler*, 323 F.3d 872, 875 n.1 (11th Cir. 2003). "For that reason, what [is] set out in this opinion as 'the facts' for summary judgment purposes may not be the actual facts." *Id. See also, e.g.*, *Matthews v. Crosby*, 480 F.3d 1265, 1269 (11th Cir. 2007) (same).

Plaintiff, Samuel Barnes, underwent a right total hip arthroplasty on February 18, 2005, during which his hip was replaced with a Trident hip prosthesis (the "Trident System" or the "System") designed, manufactured and distributed by defendant, Howmedica Osteonics Corporation.[7]  There is no genuine dispute about the fact that the "Trident System" implanted into plaintiff was comprised of four components:  a Trident Hemispherical Acetabular Shell, a Trident 0° Alumina Insert, an Accolade TMZF Plus Femoral Hip Stem, and an AluminaV40 Taper Femoral Head.[8]  Plaintiff alleged that several months later, in September of 2005, he "began suffering increasing soreness and pain about his right hip and squeaking of the hip implant," and that these symptoms continued until July 26, 2007, at which time he "underwent a revision of the right hip acetabular liner and femoral head."[9]

On January 21, 2008, defendant initiated a voluntary recall of certain Trident Hempisherical Acetabular Shells manufactured at defendant's facility in Cork, Ireland, on the basis that some tested parts "exceeded [defendant's] internal

---

[7] Doc. no. 11, Ex. A (Complaint), ¶ 6.

[8] *Id.*; doc. no. 23, Ex 2.  These components were held in place by two cancellous bone screws that, notwithstanding their inclusion in the blunderbuss ascriptions of fault in the complaint, are not genuinely at issue in this suit.  *See* doc. no. 22 (Plaintiff's Response to Defendant's Motion for Summary Judgment) (not once even using the word "screw").  The court is allowed to rely upon the facts and issues set out by the parties, and "a party may not rely on his pleadings to avoid judgment against him." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 592 (11th Cir. 1995) (quoting *Ryan v. International Union of Operating Engineers, Local, 675*, 794 F.2d 641, 643 (11th Cir.1986)); *see also* Rule 56(c)(1), (e)(2) (new text effective December 1, 2010).

[9] Doc. no. 11, Ex. A (Complaint), ¶ 8.

acceptance criteria for manufacturing residuals."[10]  This recall consisted of letters issued to physicians and hospital risk management departments explaining the scope of the recall and the potential hazards posed by the problem that precipitated it.[11]  The letter directed physicians to "monitor patients consistent with care for those receiving total hip replacement."[12]  Prior to the recall, the FDA had issued a "Warning Letter" to defendant, alerting it that the Cork facility was not in conformity with the FDA's "Current Good Manufacturing Practice" requirements and, consequently, that devices manufactured there, among which were components of the Trident System, were "adulterated within the meaning of [21 U.S.C. §] 501(h) . . . ."[13]  Defendant's recall was subsequently categorized as a "Class II" recall under FDA regulations.[14]

Plaintiff filed the present action in the Circuit Court of Lauderdale County,

---

[10] *See* doc. no. 23, Ex. 5, at 2; *see also* doc. no. 23, Ex. 6, at 1 (FDA Warning Letter relating to internal controls at defendants "Carrigtohill, County Cork, Ireland" facility).  Several other courts have also addressed and described the recall at issue here.  *E.g.*, *Cornwell v. Stryker Corp.*, No. 1:10-cv-00066-EJL, 2010 WL 4641112, at *1 (D. Idaho November 1, 2010) (rejecting theory of parallel claim based upon "Stryker Corporation's voluntary recall"); *Bass v. Stryker Corp.*, Civil Action No. 4:09-CV-632-Y, 2010 WL 3431637, at *4 (N.D. Tex. Aug. 31, 2010) ("Neither Bass's reference to the voluntary recall of certain shells by Defendants in 2008, nor to a warning letter issued by the FDA in March 2007 aides his effort to plead parallel claims."); *Parker v. Stryker Corp.*, 584 F. Supp. 2d 1298, 1301 (D.Colo. 2008) (same).

[11] Doc. no. 23, Ex. 5, at 2.

[12] *Id.*

[13] Doc. no. 23, Ex. 6, at 1.

[14] Doc. no. 23, Ex. 5, at 1.

Alabama on June 30, 2009.[15]  Plaintiff's complaint advances the following common-law tort claims: a claim based upon the so-called "Alabama Extended Manufacturer's Liability Doctrine" (Count I); Negligence (Count II); Negligent Infliction of Emotional Distress (Count III); Intentional Infliction of Emotional Distress (Count IV); Breach of Implied Warranty (Count V); Failure to Warn (Count VI); Manufacturer's Fraud (Count VII); and Misrepresentation by Omission of Material Facts (Count VIII).[16]  The complaint is paradigmatically a "shotgun pleading" in nature, essentially alleging that every action that could conceivably have been imperfect in the process that moved the Trident System from the drawing board to plaintiff's hip caused plaintiff's injuries in every conceivable way, violating in the course of that trip all possibly applicable common-law causes of action.[17]  Defendant filed a motion to dismiss the complaint for failure to state a claim upon which relief could be granted, but the Alabama circuit court judge denied the motion in a one sentence order.[18]

---

[15] Doc. no. 1, Ex. C part 1, at 2, 24.  *Note well*:  because many of the documents filed in defendant's notice of removal were collected together into individual exhibits (and so were not sequentially numbered), the page numbering for all references to the exhibits accompanying the notice of removal refer to the page numbers assigned by the Case Management/Electronic Case Filing system, rather than any indication of page number within the individual documents themselves.

[16] Doc. no. 11, Ex. A (Complaint), ¶¶ 12-63.

[17] *See id. passim*.

[18] Doc. no. 1, Ex. C part 2, at 24 (copy of the denial of defendant's motion to dismiss).

After discovery commenced, it became apparent that plaintiff sought more than $ 75,000 in damages and, in light of the fact that the parties are indisputably diverse in citizenship, defendant removed to this court.[19]  Approximately three months after removal, defendant filed a motion for summary judgment on the basis that all of plaintiff's claims were preempted by the 1976 Medical Device Amendments ("MDA"), 21 U.S.C. 360c *et seq.*, to the Food, Drug, and Cosmetics Act, 21 U.S.C. § 301 *et seq.*[20]  Defendant simultaneously filed a motion to stay discovery pending determination of its motion for summary judgment.[21]  Plaintiff responded in opposition to that motion,[22] and also filed a motion and affidavit, pursuant to Federal Rule of Civil Procedure 56(f),[23] requesting that this court defer ruling upon defendant's motion for summary judgment until after discovery was completed.[24] Finding no discovery necessary to determine the preemption questions raised in the motion for summary judgment, the court granted a stay and denied plaintiff's motion

---

[19] *See generally* doc. no. 1 (Notice of Removal); doc. no. 10 (denying plaintiff's motion to remand).

[20] Doc. no. 11; *see also* doc. no. 12 (brief supporting defendants' motion for summary judgment).

[21] Doc. no. 13.

[22] Doc. no. 15.

[23] As of December 1, 2010, the portion of Rule 56 that permits a party opposing summary judgment to request that a court defer ruling upon a motion for summary judgment until further discovery has been completed is now contained in 56(e).

[24] Doc. no. 16 & Ex. A.; *see also* doc. no. 17 & Ex. A (plaintiff's Amended Motion to Continue Defendant's Motion for Summary Judgment).

to continue.[25]

## III.  DISCUSSION

### A.    Legal Background

Prior to 1976, the "introduction of new medical devices was left largely for the States to supervise as they saw fit."  *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 315 (2008).  However, as more complex devices proliferated, Congress recognized that the common law was ill-equipped to adequately manage the risks and rewards associated with medical devices and, accordingly, enacted the Medical Device Amendments of 1976, "which swept back some state obligations and imposed a regime of detailed federal oversight."  *Id.*  As part of these amendments to the Food, Drug, and Cosmetics Act ("FDCA"), *supra*, Congress included an express preemption clause, which provides that:

> [N]o State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement —
>
> (1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and
>
> (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

---

[25] Doc. no. 21, at 1-2.

21 U.S.C. § 360k(a).  The analysis under this provision, as explained by the Supreme Court, requires a court to determine (1) "whether the Federal Government has established requirements applicable to" a specific device, and (2) whether the state law claims would impose safety and effectiveness requirements that are "different from, or in addition to" those under federal law.  *Riegel*, 552 U.S. at 321.

The regulatory regime outlined in the MDA groups medical devices into three classes, based upon the risks the devices present.  *Id.* at 315-16.  Class I devices, which pose little to no risk, are subject only to relatively slight "general controls" also applicable to all other devices. 21 U.S.C. § 360c(a)(1)(A). "Class II [devices], which include[] such devices as powered wheelchairs and surgical drapes, . . . [are] subject in addition to 'special controls' such as performance standards and postmarket surveillance measures . . . ." *Riegel*, 552 U.S. at 316-17; § 360c(a)(1)(B).  Class III devices, "which include replacement heart valves . . . and pacemaker pulse generators," are subject to "the most federal oversight . . . ." *Riegel*, 552 U.S. at 317; § 360c(a)(1)(C).[26]  Devices assigned to this final classification are those for which safety cannot adequately be assured through the mechanisms assigned to less stringent classifications, and which are either "purported or represented to be for a use

---

[26] As a personal aside, the undersigned judicial officer notes that he has two Class III devices: a Bovine tissue aortic replacement valve, implanted at Vanderbilt University Hospital on May 18, 2009; and, a St. Jude Medical Cardiac Pacemaker, implanted at Huntsville Hospital on Oct. 19, 2010.

in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health," or "present[] a potential unreasonable risk of illness or injury." § 360c(a)(1)(C); *see also Riegel*, 552 U.S. at 317.

All new Class III devices must undergo clinical trials and review before they can be sold. *Id.* at 317. However, a small percentage of Class III devices undergo "a rigorous regime of premarket approval" (commonly, and hereinafter, referred to as "PMA"), during which the Food and Drug Administration (the "FDA"), often alongside a panel of selected experts, spends, on average, 1,200 hours reviewing a voluminous amount of information submitted by the applicant for approval, including

> full reports of all studies and investigations of the device's safety and effectiveness that have been published or should reasonably be known to the applicant; a "full statement" of the device's "components, ingredients, and properties and of the principle or principles of operation"; "a full description of the methods used in, and the facilities and controls used for, the manufacture, processing, and, when relevant, packing and installation of, such device"; samples or device components required by the FDA; and a specimen of the proposed labeling. § 360e(c)(1).

*Riegel*, 552 U.S. at 318. After considering these materials, the FDA will only approve a device when "it finds there is a 'reasonable assurance' of the device's 'safety and effectiveness,' § 360e(d)." *Riegel*, 552 U.S. at 318. In making that judgment, "[t]he agency must 'weig[h] any probable benefit to health from the use of the device against any probable risk of injury or illness from such use,' §

360c(a)(2)(c)." *Id.* The agency "may thus approve devices that present great risks if they nonetheless offer great benefits in light of available alternatives." *Id.*

Once approved through the PMA process, a manufacturer must submit and receive supplemental premarket approval from the FDA for any "changes in design specifications, manufacturing processes, labeling, or any other attribute, that would affect safety or effectiveness to a device," and the FDA evaluates all proposed changes "under largely the same criteria as an initial application." *Riegel*, 552 U.S. at 319 (citing 21 U.S.C. § 360e(d)(6); 21 C.F.R. § 814.39(c)). "[T]he FDA requires a device that has received premarket approval to be made with almost no deviations from the specifications in its approval application . . . ." *Id.* at 323. Further, manufacturers of PMA-approved devices are subject to onerous post-approval reporting requirements, 21 U.S.C. § 360i, that require them to inform the FDA of any new studies or clinical investigations of the device and, crucially, "to report incidents in which the device may have caused or contributed to death or serious injury, or malfunctioned in a manner that would likely cause or contribute to death or serious injury if it recurred . . . ." *Riegel*, 552 U.S. at 319 (citing 21 C.F.R. § 803.50(a)). The FDA has authority to withdraw premarket approval based upon any new or reevaluated information, 21 U.S.C. § 360e(e)(1), and may order recalls of devices determined to present a risk of "serious, adverse health consequences," *id.* § 360h(e).

In *Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996), five Justices concluded, albeit in separate opinions, that state negligence and strict liability causes of action imposed "requirements" that would be preempted by requirements under federal law or regulations specific to a particular medical device. *See id.* at 503-05 (Breyer, J., concurring in part and concurring in judgment); *id.* at 512 (O'Connor, J., concurring in part and dissenting in part). The majority in *Lohr*, however, held that most Class III devices were not subject to "device-specific 'requirements.'" *See Riegel*, 552 U.S. at 322 (quoting *Lohr*, 518 U.S. at 493). The Court noted that the majority of Class III devices are not subjected to the PMA process, but are instead approved under 21 U.S.C. § 510(k), which permits new devices to be marketed if they are "substantially equivalent" to devices "grandfathered" under the 1976 Amendments. *Lohr*, 518 U.S. at 493-94. Neither the requirements a device must satisfy for § 510(k) approval before it may be marketed, nor the conditions imposed upon any changes to the device or its labeling after it is introduced onto the market, relate to the safety and effectiveness of that device. Instead, "[t]he 510(k) process is focused on equivalence, not safety." *Id.* at 493 (internal quotations omitted) (alteration in original). Accordingly, since that process imposed no initial or ongoing federal safety or effectiveness requirements, it was not logically possible for state safety requirements to be "in addition to, or different from" the federal requirements. *Id.* at 495-502; *see*

13

*also McMullen v. Medtronic, Inc.*, 421 F.3d 482, 487 (7th Cir. 2005) ("To have preemptive effect under § 360k(a), a federal requirement must be specific to a particular device . . . .").

Devices that are PMA-approved, however, are invariably subject to "'requirements' under the MDA as [the Court] interpreted it in *Lohr*" and, consequently, any state cause of action that imposes a requirement that is "different from, or in addition to" the federal requirements is preempted. *Riegel*, 552 U.S. at 321-22. "[P]remarket approval imposes 'requirement[s] relating to safety [and] effectiveness' because the FDA requires a device that has received premarket approval to be made with almost no design, manufacturing, or labeling deviations from the specifications in its approved application." *Altria Group, Inc. v. Good*, — U.S. —, 129 S. Ct. 538, 549 (2008) (quoting § 360(k)).

Moreover, the Court in *Riegel* reiterated that "[g]eneral tort duties of care . . . 'directly regulate' the device itself . . . ." *Riegel*, 552 U.S. at 328-29. Hence, when a suit involves a device approved through the PMA process, "§ 360k(a) . . . preempt[s] most common-law tort duties" as challenges to the safety and effectiveness of a device because "state-law tort suits would interfere with the requirements that the FDA imposed for a particular device through the extensive PMA process for Class III devices . . . ." *Howard v. Sulzer Orthopedics, Inc.*, 382

14

Fed. Appx. 436 (6th Cir. 2010) (citing *Riegel*, 552 U.S. at 323-25); *see also Funk v. Stryker Corp.*, 673 F. Supp. 2d 522, 526 (S.D. Tex. 2009) (noting, in a case involving the same device at issue here, that the "Supreme Court found that all PMA-approved devices met the first prong of preemption").

The MDA's preemption provision is to be read consistent with Congress's clear "intent to pre-empt a large area of state law." *Altria Group, Inc.*, — U.S. —, 129 S. Ct. at 548.  Nevertheless, the following language from the Court's opinion in *Riegel* left some room for state law tort claims to survive preemption:

> State requirements are pre-empted under the MDA only to the extent that they are "different from, or in addition to" the requirements imposed by federal law. [21 U.S.C.] § 360k(a)(1). Thus, § 360k does not prevent a State from providing a damages remedy for claims premised on a violation of FDA regulations; the state duties in such a case 'parallel,' rather than add to, federal requirements.

*Riegel*, 552 U.S. at 330 (some citations omitted).  Thus, the otherwise broad preemptive scope of § 360k would not reach a state law that simply permits a "parallel" remedy for what would already be a violation of the federal requirements to which a device is subject.  *Id.*  A plaintiff must, however, "adequately plead" such a "parallel claim," providing "concrete allegations" of identifiable violations of "specific federal requirement[s]" to sidestep preemption.  *In re Medtronic, Inc., Sprint Fidelis Leads, Products Liability Litigation*, 623 F.3d 1200, 1206-07 (8th Cir.

15

2010). Such claims do not contravene the policy embodied in the preemption clause because they merely reinforce, rather than upset, the careful, device-specific risk/benefit analysis that underpins FDA decisions to approve devices that cannot be rid of *all dangers* to health, but, which — despite some inherent dangers to health — represent a significant advance in overall welfare. *Id.* at 1206.

**B.    PMA Approval of the Trident System**

Plaintiff's principle argument is that the Trident System was not PMA-approved as such. Instead, he contends, "[o]nly the ceramic-on-ceramic bearing components of the Trident System received approval pursuant to the PMA process."[27] The other components, according to plaintiff, were approved under the § 510(k) "substantially equivalent" process.[28] Plaintiff now asserts, though he did not in his complaint, that his claims arise only from the other portions of the device.[29] Therefore, he argues, the Trident System, like the device at issue in *Lohr*, is not subject to device-specific safety and effectiveness requirements and, consequently, the MDA's express preemption clause does not apply.[30]

In support of this proposition, plaintiff first submits documentation apparently

---

[27] Doc. no. 22, at 13.

[28] *Id.* at 13; *see also id.* at 2-4, 7.

[29] *Id.* at 13-15.

[30] *Id.* at 12-13.

showing that the FDA approved the Trident Hemispherical Acetabular Shell through the § 510(k) process in 2001, and assigned it a Class II regulatory status.[31]  However, as at least a dozen other courts examining this very device have either explicitly or implicitly held, prior approval of some components of a device through the § 510(k) process does not affect the preemptive effect of subsequent PMA approval.  *E.g.*, *Cornwell v. Stryker Corp.*, No. 1:10-cv-00066-EJL, 2010 WL 4641112, at *3 (D. Idaho Nov. 1, 2010) (rejecting the plaintiff's argument that, because the "Trident acetabular cup was initially approved via the § 510(k) process," his state law claims were not preempted "even though it was later approved for use with the ceramic-on-ceramic Trident System which received PMA approval," and noting that this "argument has been rejected by every other court determining whether the acetabular cup received approval via the PMA process"); *Lewkut v. Stryker Corp.*, No. 09-cv-3695, — F. Supp. 2d. —, 2010 WL 1544275, at *5 (S.D. Tex. Apr. 16, 2010) (same); *Phillips v. Stryker Corp.*, No. 3:09-CV-488, 2010 WL 2270683, at *5 (E.D. Tenn. June 3, 2010) ("[D]efendants have provided FDA documentation demonstrating conclusively that the acetabular cup received FDA approval under the PMA process"); *Lemelle v. Stryker Orthopaedics*, 698 F. Supp. 2d 668, 670, 679

---

[31] *See* doc. no. 23, Ex. 1, at 2-3; *see also* doc. no. 23, Ex. 7, at 5-8 (approval under § 510(k) of predecessor component); doc. no. 23, Ex. 8, at 5-7 (approval under § 510(k) of predecessor version of the Trident Acetabular Shell).

(W.D. La. 2010) (dismissing state law product liability claims against the Trident System, including those involving acetabular shells); *Funk v. Stryker Corp.*, 673 F. Supp. 2d 522, 530-31 (S.D. Tex. 2009) (treating the Trident System as a single device and concluding that it was approved under the PMA process); *Bausch v. Stryker Corp.*, No. 08 C 4248, 2008 WL 5157940, at *3 (N.D. Ill. Dec. 9, 2008) (noting that the Trident System, including the acetabular shell, was subjected to the process of pre-market approval and therefore subject to federal regulations).

Plaintiff is correct that there is language in the "Summary Minutes" of a panel meeting regarding the Trident System's PMA application indicating that only the ceramic inserts were under consideration.[32]  However, those minutes also indicate why plaintiff's argument must fail.  The language to which plaintiff points is a summary of a statement by the sponsor of the system, *i.e.* by personnel of the entities that sought the review.[33]  The minutes reflect, however, that Dr. Celia Witten, the FDA's director for the Division of General and Restorative devices, "clarified for the panel [just prior to the PMA vote] that they would be voting on an entire system and

---

[32] Doc. no. 23, Ex. 4, at 7-8, 13-15 (a copy of the "Summary Minutes of the Orthopedic and Rehabilitation Devices Panel of the Medical Devices Advisory Committee," during which defendant's application for premarket approval of the Trident System was discussed and voted upon).

[33] *Id.* at 12.

not just the ceramic on ceramic interface."[34]

Moreover, the summary of safety and effectiveness data that accompanied the Trident System's 2003 PMA "Summary of Safety and Effectiveness Data" describes the acetabular shell as a "component."[35]  That document also describes as among the "battery of tests . . . completed on the system" several specifically conducted on the "Trident Hempisherical Acetabular Cup."[36]   Most importantly, the "Risk/Benefit Analysis" conclusions drawn by the FDA expressly refer to the "metal acetabular shell" and, indeed, all components of plaintiff's implant.[37]   Accordingly, and in line with all examined rulings regarding the Trident System, the court finds plaintiff's argument that his claims are not preempted because some components were not PMA-approved is without merit.  *Bass v. Stryker Corp*., No. 4:09-CV-632-Y, 2010 WL 3431637, at *3 (N.D. Tex. Aug. 31, 2010) (holding it "established that the Shell, as a component of the Trident System, was subject to the rigorous premparket-

---

[34] *Id.* at 12, 16.  There is a further indication in the minutes that lead FDA reviewer Peter Allen indicated that "[i]t is the ceramic or [*sic*] ceramic couple that makes these systems investigational." *Id.* at 14.  Yet that citation to the minutes itself emphasizes that the *system*, not just the couple, is under investigation and indicates that the couple is the *reason* the entire system is under investigation.

[35] Doc. no. 23, Ex. 3, at 2.

[36] *See id.* at 7, 9.; *e.g. id.* at 7 ("High cycle fatigue testing of the Trident Acetabular System with the alumina insert has been performed. . . .  Qualitatively, slightly more damage was seen on the femoral stem tapers than the taper lock between the acetabular shell and liner of the Trident components.  These results indicate a stable interface exists between the liner and shell for up to ten million cycles.").

[37] *See id.* at 15-16.

approval review on which the Supreme Court's analysis in *Riegel* was based, causing claims based on the Shell to be preempted under § 360k(a)").

Because the Trident System as a whole, including all of its component parts, was PMA-approved, the MDA's express preemption clause, 21 U.S.C. § 360k(a), applies. Accordingly, any causes of action plaintiff alleges that would impose safety requirements different from or in addition to the federal requirements to which the System is subject, are preempted.

## C.    Express Preemption Under the MDA

Plaintiff also argues that, even if the Trident System as a whole was PMA-approved and, hence, that the MDA's express preemption clause is applicable, not all of his state claims are preempted. As other courts have noted in this context, the Supreme Court's opinion *Riegel* made clear that the MDA preempts only those claims arising under state law that impose upon medical devices safety and effectiveness requirements that are different from, or in addition to device-specific federal safety and effectiveness requirements. *E.g.*, *In re Medtronic, Inc., Sprint Fidelis Leads, Products Liability Litigation*, 623 F.3d at 1207-08 (noting that it is somewhat unclear whether express warranty claims would be preempted because there is Supreme Court precedent suggesting such warranties are better characterized as contracts than requirements imposed by state law); *Huber v. Howmedica Osteonics Corp.*, No.

07-2400 (JLL), 2008 WL 5451072, at *3 (D.N.J. Dec. 31, 2008) (same). *Riegel* did not expressly delineate which state-law tort claims, if any, would not be preempted because they lay outside this definition. Plaintiff contends that at least two of his claims are not preempted by § 360k(a), as it was construed in *Riegel*.

Initially, plaintiff contends that the Supreme Court's decision in *Wyeth v. Levine*, — U.S. —, 129 S. Ct. 1187 (2009), "in many ways completely retreats from its ruling in *Riegel*."[38] This assertion is entirely without merit. *Wyeth* expressly distinguished the preemption applicable to medical devices, for which Congress enacted an express preemption clause, and prescription drugs, for which there is no express preemption clause and which were at issue in that case. *Id.* at 1196. In fact, the court expressly cited *Riegel* immediately before noting that "Congress enacted an express pre-emption provision for medical devices in 1976[, but] it declined to enact such a provision for prescription drugs." *Id.* The Court quoted *Riegel*'s observation that "'Congress could have applied the pre-emption clause to the entire FDCA. It did not do so, but instead wrote a *pre-emption clause that applies only to medical devices*.'" *Id.* at 1200 (emphasis supplied) (quoting *Riegel*, 552 U.S. at 327). The full text of the very passage plaintiff quotes for his extraordinarily unconvincing reading of the case reiterates the same point: only with respect to "*drug* labeling" has

---

[38] Doc. no. 22, at 20.

"Congress . . . repeatedly declined to pre-empt state law . . . ."  *Id.* at 1204.  By contrast, where, as here, there is an express preemption provision, "the presumption against preemption dissipates [because] the intention of Congress is 'clear and manifest.'"  *Smith v. CSX Transportation, Inc.*, 381 Fed. Appx. 885, 886 (11th Cir. 2010) (quoting *Riegel*, 552 U.S. at 334).   "*Wyeth* turned on implied conflict preemption, not express preemption, because Congress did not extend the express preemption for medical devices in § 360k to prescription drugs."  *In re Medtronic, Inc., Sprint Fidelis Leads Products Liability Litigation*, 623 F.3d at 1206; *see also, e.g.*, *Wimbush v. Wyeth*, 619 F.3d 632, 644 (6th Cir. 2010) ("There is no similar express preemption provision for drugs under the FDCA.").  For all of these reasons, therefore, this court concludes that the decision in *Wyeth* did not affect the scope of preemption announced in *Riegel*.

Plaintiff's contention that, "[i]n *Riegel*, the United States Supreme Court did not address preemption with regard to . . . breach of implied warranty" reflects a similar lack of care in actually reading the cases plaintiff cites as support for that argument.[39] The Court in *Riegel* expressly *did* address an implied warranty claim, and held it to be among those preempted because it imposed a duty "different from, or in addition to" the requirements imposed by federal law.  *Riegel*, 552 U.S. at 327-29

---

[39] *Id.* at 21.

(rejecting argument that "implied-warranty claims are not pre-empted"); *see also id.* at 320-21, 330 (discussing the district court's holding that "the MDA pre-empted Riegel's claims of . . . breach of implied warranty" and the Second Circuit's affirmance of that ruling, which the Court itself affirmed).  Plaintiff's implied breach of warranty claim is explicitly within the scope of § 360k(a) and is, therefore, preempted.  The court need not address plaintiff's contention that "express warranty" claims are not preempted because, contrary to the indication in his brief, plaintiff never alleged breach of an express warranty.[40]

Beyond the implied warranty claim, the only other claim that plaintiff argues would not be preempted if the scope of § 360k outlined in *Riegel* retains the form the Supreme Court originally gave it, as it clearly does, is his failure-to-warn claim.[41] That contention, however, also is unavailing.  First, as the Eighth Circuit cogently explained, a state-law failure-to-warn claim expressly suggests that a manufacturer "was required to give additional warnings, *precisely* the type of state requirement that is 'different from, or in addition to' the federal [labeling and warning] requirements and therefore preempted."  *In re Medtronic, Inc., Sprint Fidelis Leads, Products Liability Litigation*, 623 F.3d at 1205 (emphasis supplied).  Second, beyond noting

---

[40] *See* Doc. no. 11, Ex. 1 (Complaint), *passim* (only using the word "warranty" in the body of the complaint in Count V, entitled "Breach of Implied Warranty").

[41] Doc. no. 22, at 20 ("Plaintiff's Failure to Warn Claim[] . . . [is] Not Preempted by the Medical Device Act.").

that *Wyeth* addressed a failure-to-warn claim, plaintiff neglects to advance even a scintilla of argument in support of the proposition.[42]  This court has serious doubts about whether any sincere argument could be conjured to bolster plaintiff's contention, but speculation is unnecessary.  The court "decline[s] to assume the role of counsel and make a new argument for" plaintiff.  *United States v. Docampo*, 573 F.3d 1091, 1103 (11th Cir. 2009).

The court is unpersuaded that any of plaintiff's causes of action are not state safety and effectiveness requirements such that they would be preempted under 21 U.S.C. § 360k(a), as construed in *Riegel*.  Accordingly, all of plaintiff's claims are preempted unless they are "'*genuinely* equivalent'" to the requirements imposed on the Trident System under federal law.  *McMullen v. Medtronic, Inc.*, 421 F.3d 482, 489 (7th Cir. 2005)  (quoting *Bates v. Dow Agrosciences LLC*, 544 U.S. 454 (2005) (emphasis in original)).  In short, summary judgment is due to be granted unless plaintiff has pled a claim that imposes "state duties [that] 'parallel,' rather than add to, federal requirements."  *Riegel*, 552 U.S. at 330.

## D.    Parallel Claim Issues

Plaintiff appears to concede that, if the Trident System is a PMA-approved medical device, as indeed it is, the torts he alleges in Counts I through IV and VIII

---

[42] *Id.* at 20-22.

of his complaint would be preempted unless they parallel federal law[43]  The Court in

*Riegel* held that a "State [may] provid[e] a damages remedy for claims premised on

a violation of FDA regulations; the state duties in such a case 'parallel,' rather than

add to, federal requirements."  552 U.S. at 330 (quoting *Medtronic, Inc. v. Lohr*, 518

U.S. 470, 495 (1996)).  Plaintiff contends that he asserts such a "parallel" claim.[44]

Defendant, however, counters that plaintiff failed to adequately plead violation of

federal requirements, and points out that plaintiff never moved to amend his

complaint to assert any.[45]  Defendant is correct.  Plaintiff did not plead a violation of

federal regulations, or that any violation that did occur caused his injuries, with

anything nearing the degree of "factual content" necessary to state a claim under

Federal Rule of Civil Procedure 8(a)(2).  *See Ashcroft v. Iqbal*, 556 U.S. —, 129 S.

Ct. 1937, 1949 (2009).

　　　　To assert a parallel claim, a plaintiff must provide "factual detail to substantiate

---

[43] *See id.* at 20-22 ("Plaintiff's Failure to Warn Claims and Breach of Warranty Claims Are Not Preempted by the Medical Device Act").  Issues and contentions not raised in a party's brief are deemed abandoned.  *See, e.g.*, *Chapman v. A.I. Transport*, 229 F.3d 1021, 1027 (11th Cir. 2000) ("Parties opposing summary judgment are appropriately charged with the responsibility of marshaling and presenting their evidence before summary judgment is granted, not afterwards."); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (holding that a district court can "properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment") (citing *Lazzara v. Howard A. Esser, Inc.*, 802 F.2d 260, 269 (7th Cir. 1986) (holding that a ground not pressed in opposition to a motion for summary judgment is to be treated by the district court as abandoned)).

[44] Doc. no. 22, at 17-20.

[45] Doc. no. 12, at 16-19.

th[e] crucial allegation": namely, facts that "specify in what way or ways defendants violated any one or more of th[e relevant] regulations." *Parker v. Stryker Corp.*, 584 F. Supp. 2d 1298, 1302 & n.5 (D. Colo. 2008) (alterations added). A plaintiff is required, in order to circumvent preemption, "to establish the necessary link between defendants' federal violations and [his] alleged causes of action." *Horowitz v. Stryker Corp.*, 613 F. Supp. 2d 271, 280 (E.D.N.Y. 2009) (alteration added). "[N]aked assertions devoid of further factual enhancement" do not assert any claim at all. *Iqbal*, 556 U.S. —, 129 S. Ct. at 1949 (citation and internal quotation marks omitted). Consequently, they may not be relied upon to avoid summary judgment where it is otherwise due to be granted. *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004). Further, "[a] plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment." *Id.* (alterations added).

Nowhere in plaintiff's complaint does he provide even a single citation to a federal regulation or statute that defendant may have violated, much less "sufficient factual detail" to plausibly give rise to an inference such a violation occurred, or how any such violation proximately caused the harm he claims. *Iqbal*, 556 U.S. —, 129 S. Ct. at 1949 (holding that Federal Rule of Civil Procedure 12(b)(6) demands "more than an unadorned, the-defendant-unlawfully-harmed-me accusation").

Plaintiff has not adequately pled that defendant violated any federal regulation.

Indeed, plaintiff only refers to "federal regulations" twice over the nineteen pages of his complaint.  The first mention simply states that defendant's recall of some Trident System components was "classified as a Class II Recall under federal regulation."[46] Simply alleging that a device was recalled and that federal regulations provided a label for that recall, without more, is not sufficient.  Doing so fails entirely to allege any regulatory violation with respect to plaintiff's specific device.  *See, e.g.*, *In re Medtronic, Inc., Sprint Fidelis Leads Products Liability Litigation*, 623 F.3d at 1204, 1205-07 (rejecting, as insufficiently pled, asserted parallel claims regarding a device subject to "a Class I recall, the most serious type of medical device recall," and one significantly more serious than that alleged here).  This is so because the regulatory basis for a manufacturer's actions that the FDA subsequently classifies as a recall often will not necessarily even imply that a single device it created was defective.[47]

---

[46] Doc. no. 23, Ex. 1 (Complaint), ¶ 11; *see also* doc. no. 22, at 18-19 (setting forth, in opposition to defendant's motion for summary judgment, the portions of plaintiff's complaint he contends adequately plead a parallel claim).

[47] The present situation is an ideal example.  The warning letter to which plaintiff refers that served as a basis for the recall plaintiff identifies, as the regulations that rendered the devices "adulterated within the meaning of § 501(h) of the Act," nonconformity of certain facilities and internal protocols with the FDA's Current Good Manufacturing Practice regulations, namely:  (1) "Failure to establish and maintain adequate procedures for implementing a corrective and preventative action, as required by 21 CFR 820.100(a)"; (2) "Failure to establish and maintain adequate procedures to control product that does not conform to specified requirements, including the evaluation of nonconforming product, as required by 21 CFR 820.90(a)"; (3) "Failure to establish and maintain adequate procedures to implement and record changes in methods and procedures needed to correct and prevent identified quality problems, as required by 21 CFR 820.100(a)(5)"; and (4) "Failure to establish and maintain adequate procedures for rework, to include retesting and reevaluation of the nonconforming product after rework, to ensure that the product meets its current

It certainly does not indicate that "*his particular system* violated a federal regulation in any way."  *Covert v. Stryker Corp.*, No. 1:08CV447, 2009 WL 2424559, at *15 (M.D. N.C. Aug. 5, 2009) (emphasis in original).  Here, the "recall" consisted of voluntary notification letters sent to hospitals which "recommend[ed] . . .physicians to monitor patients consistent with care for those receiving total hip replacement" on the basis that "[s]ome of the parts tested exceeded internal acceptance criteria for manufacturing residuals."[48]  Plaintiff did not plead those facts; but even if he had, they do not plausibly indicate that plaintiff's system was defective nor, for that matter, that defendant ever released a single defective Trident System to the public.

The only other reference in the complaint to federal requirements is found in a kitchen-sink allegation that defendant violated "state and federal regulations" with respect to "research, testing, design, development, manufacture, inspection, production, advertisement, marketing, promotion, distribution, and/or sale."[49]  A court must ignore such "bare legal conclusions" in determining whether a complaint has

---

approved specifications, as required by 21 CFR 820.90(b)(2)."  *See* doc. no. 23, Ex. 6 (warning letter); doc. no. 22, at 17-18 (citing the letter and recall notice (doc. no. 23, Ex. 5) in support of argument that plaintiff adequately pled a parallel claim).  A manufacturer may produce a device in a facility without these procedures in place without ever having produced a single device that would harm an individual.  Consequently, a recall based upon such facts could *only* be "'merely consistent with' a defendant's liability[;] it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'"  *Ashcroft v. Iqbal*, 556 U.S. —, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)) (alterations added).

[48] Doc. no. 23, Ex. 5, at 2, 11-13.

[49] *See* doc. no. 11, Ex. A (Complaint), ¶ 25.

adequately stated a claim. *Jacobs v. Tempur-Pedic International, Inc.*, No. 08-12720, — F.3d —, 2010 WL 4880864, at *1-2 (11th Cir. Dec. 2, 2010). A "plaintiff[] cannot simply incant the magic words '[defendant] violated FDA regulations' in order to avoid preemption." *In re Medtronic, Inc., Sprint Fidelis Leads Products Liability Litigation*, 592 F. Supp. 2d 1147, 1158 (D. Minn. 2009); *see also Gelber v. Stryker Corp.*, No. 09 Civ. 1322 — F. Supp. 2d —, 2010 WL 4740432, at *5 (S.D.N.Y. Sept. 14, 2010) (same, in discussion of the device at issue here). To hold otherwise would eviscerate the MDA's preemption provision and the carefully considered policy it embodies, namely that "the solicitude for those injured by FDA-approved devices . . . was overcome in Congress's estimation by solicitude for those who would suffer without new medical devices if juries were allowed to apply the tort law of 50 States to all innovations." *Riegel*, 552 U.S. at 326.

The only other allegations to which plaintiff points to support his argument that the complaint contains "numerous allegations by Plaintiff that the Defendant failed to comply with the rigorous requirements set forth by the FDA" paragraphs generally asserting that defendant knowingly, with deliberate indifference, willfully, recklessly, or negligently failed in every conceivable way to properly conduct itself with respect to every aspect of the Trident System.[50]  These do not even generically mention

---

[50] *See* doc. no. 22, at 18-19 (citing doc. no. 23, Ex. 12 (another copy of the Complaint, identical to the copy marked as doc. no. 11, Ex. A), ¶¶ 10-11, 21, 23, 25, 28).

federal regulation.[51]   "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.''"   *Ashcroft v. Iqbal*, 556 U.S. —, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).   Plaintiff has failed even to go that far.   Without pleading violation of some specific federal requirement, plaintiff has not plead facts colorably consistent with defendant's liability under a parallel claim much less facts demonstrating he is plausibly entitled to recover under such a claim.

Further, plaintiff did not allege any facts at all suggesting how "variation in [his particular device] from specifications approved by the FDA" caused him harm. *Carson v. Depuy Spine, Inc.*, 365 Fed. Appx. 812, 814 (9th Cir. 2010) (noting that alleged deviation from federal regulations does not absolve a plaintiff of the need to allege, and ultimately prove, all the traditional elements of the tort providing the parallel claim, including causation).   "Even alleging violations of federal law is not sufficient; there must be a cognizable link between the violations and the injury suffered by the plaintiff." *Gelber*, — F. Supp. 2d —, 2010 WL 4740432, at *6.   In order to assert a viable parallel claim, a plaintiff must allege at least some facts tying a substantive violation of the applicable regulations to his injuries. *E.g.*, *Riley v.*

---

[51] *Id.*

*Cordis Corp*., 625 F. Supp. 2d 769, 784-85 (D. Minn. 2009) (holding that a party purporting to assert a parallel claim must allege how the substantive FDA caused the harm alleged); *Horowitz*, 613 F. Supp. 3d at 282 (holding that a "plaintiff must demonstrate that the particular federal violation led to the injuries he sustained"); *see also Anthony v. Stryker*, No. 1:09-cv-2343, 2010 WL 1387790, at *4 (N.D. Ohio Mar. 31, 2010) (dismissing claims identical to those argued by plaintiff here regarding the same device because the plaintiff "did not plead any facts that would lead this court to plausibly infer that Stryker's noncompliance with FDA regulations led to his injury"). Accordingly, in addition to failing adequately to plead any violation of FDA regulations sufficient to raise a colorable parallel claim, "[p]lainfiff has [also] failed to demonstrate that the injuries [he] sustained resulted from the federal violations" and, therefore, may not avoid summary judgment on the basis of a parallel claim. *Horowitz*, 613 F. Supp. 2d at 283 (alteration added).

Plaintiff never sought leave to amend his complaint to "allege a state-law claim which is 'genuinely equivalent' to a federal requirement, *i.e.*, one which is premised upon the violation of a federal 'requirement,'" *Covert*, 2009 WL 2424559 at *12, and he may not now do so simply by arguing it in his response to defendant's motion for summary judgment. *See also McMullen v. Medtronic, Inc.*, 421 F.3d 482, 489 (7th Cir. 2005) ("In order for a state requirement to be parallel to a federal requirement,

and thus not expressly preempted under § 360k(a), the plaintiff must show that the requirements are '*genuinely* equivalent.'" (quoting *Bates v. Dow Agrosciences LLC*, 544 U.S. 454 (2005) (emphasis in original)).  A party "cannot amend its Complaint by adding a new claim in its summary judgment papers . . . ." *Corey Airport Services, Inc. v. Decosta*, 587 F.3d 1280, 1282 (11th Cir. 2009); *see also Gilmour*, 382 F.3d at 1315 ("At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a)."); *Newman v. Ormond*, No. 10-11458, 2010 WL 3623174, at *2 (11th Cir. Sept. 20, 2010) ("Although the Supreme Court has mandated liberal pleading standards for civil complaints, the standard 'does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage.'") (quoting *Gilmour,* 382 F.3d at 1314).

Moreover, even had plaintiff adequately alleged, as he now argues, that his negligence claim was premised upon the deviation from internal manufacturing specifications that precipitated the recall of certain Trident components, his claim would still be to no avail.  There is yet another variety of preemption that would preclude some of the "parallel" claims that 21 U.S.C. § 360k(a), as construed in *Riegel*, would appear to permit.  Section 337(a) of the FDCA provides that all actions to enforce FDA requirements "shall be by and in the name of the United States."  21 U.S.C. § 337(a).  In *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341

(2001), the Supreme Court construed § 337(a) as barring suits by private litigants "for noncompliance with the medical device provisions." *Id.* at 349 n.4. More specifically, the court held impliedly preempted a common law tort claim that arose "solely from the violation of FDCA requirements." *Id.* at 353. The court stated that any tort would be similarly preempted where "the[] federal enactments [are] a critical element in the[] case" because such a claim would "not be relying on traditional state tort law which had predated the federal enactments in questions." *Id.* (alterations added). Reasoning that to require a device manufacturer to "comply[] with the FDA's detailed regulatory regime in the shadow of 50 States' tort regimes" "would exert an extraneous pull on the scheme established by Congress," the Supreme Court held that the FDCA, as amended by the MDA, impliedly preempted such state law claims. *Id.* at 350, 353 (alterations added). "[W]e have clear evidence that Congress intended that the MDA be enforced exclusively by the Federal Government." *Id.* at 352. The "delicate balance of statutory objectives" could be "skewed by allowing . . . claims under tort law" premised purely upon violation of FDA regulations. *Id.* at 348.

As several courts have noted, the interaction between these two species of preemption is far from clear. *E.g.*, *In re Medtronic, Inc., Sprint Fidelis Leads, Products Liability Litigation*, 623 F.3d 1200, 1204 (8th Cir. 2010) ("The contours of the parallel claim exception were not addressed in *Riegel* and are as yet [in light of

33

*Buckman*] ill-defined."); *Phillips v. Stryker Corp.*, No. 3:09-CV-488, 2010 WL 2270683, *6 (E.D. Tenn. June 3, 2010) ("This Court notes the difficulty that lower courts, in the wake of the *Riegel* decision, have had in determining whether a particular plaintiff's state law claims survive express preemption under *Riegel* but not implied preemption under *Buckman*."). The Supreme Court in *Riegel* did not discuss *Buckman* at all, and so, in the two years that have passed since *Riegel* was decided, "attempts to reconcile the language in *Buckman* with that in *Riegel* have spawned various frameworks for analyzing claims" like those plaintiff asserts in his brief opposing summary judgment. *Id.* at *7.

Some courts have held that a "Plaintiff[] cannot make an end run around *Riegel* by recasting violations of the FDCA as violations of state common law," because that would be the very type of claim *Buckman* held impliedly preempted. *In re Medtronic, Inc., Sprint Fidelis Leads Products Liability Litigation*, 592 F. Supp. 2d 1147, 1161 (D. Minn. 2009). These courts reason that a plain reading of *Buckman* suggests that a state tort claim would not be impliedly preempted only if "the conduct on which [it] is premised [is] the type of conduct that would traditionally give rise to liability under state law — and that would give rise to liability under state law even if the FDCA had never been enacted." *Riley*, 625 F. Supp. 2d at 777; *see also Stengel v. Medtronic, Inc.*, No. CV 10-318-TUC-RCC, 2010 WL 4483970, *3 (D. Ariz. Nov. 2, 2010)

34

(holding that, to survive implied preemption, a claim must "rest on conduct that is actionable even if the federal law did not exist").

> Read together, "*Riegel* and *Buckman* create a narrow gap through which a plaintiff's state-[common-]law claim must fit if it is to escape express [and] implied preemption. The plaintiff must be suing for conduct that *violates* the FDCA (or else his claim is expressly preempted by § 360k(a)), but the plaintiff must not be suing *because* the conduct violates the FDCA (such a claim would be impliedly preempted under *Buckman*)."

*In re Medtronic, Inc., Sprint Fidelis Leads Products Liability Litigation*, 623 F. 3d at 1204 (quoting *Riley*, 625 F. Supp. 2d at 777) (alterations added). These courts have held that "an adequately pleaded claim that a specific device was not manufactured in accordance with its PMA specifications can survive [both types of] preemption" and, "similarly, if a state were to pass a statute providing a remedy for a violation of the FDCA, a claim under such statute would not be preempted." *In re Medtronic, Inc., Sprint Fidelis Leads Products Liability Litigation*, 592 F. Supp. 2d at 1161 (alterations added). They further note that "[e]ven the minority of courts" that have permitted "generalized" tort claims for "violations of federal regulations," have done so only "in cases of substantive violations, not administrative violations." *Hughes v. Boston Scientific Corp.*, 669 F. Supp. 2d 701, 713 (S.D. Miss. 2009) (collecting the lion's share of cases "reject[ing] negligence *per se* claims based on alleged violations of FDA regulations as contrary to Congressional intent").

35

Other courts have stated that "the Supreme Court's last word on the subject is that '§ 360k does not prevent a State from providing a damages remedy for claims premised on a violation of FDA regulations.'" *Phillips*, 2010 WL 2270683, at *7 (quoting *Riegel*, 552 U.S. at 330). These courts generally have reasoned that, after *Riegel*, *Buckman* should be either ignored or restricted to its facts as to claims based upon the alleged failure of a medical device. *E.g.*, *Purcel v. Advanced Bionics Corp.*, No. 3:07-CV-1777-M, 2010 WL 2679988, at *5 (N.D. Tex. June 30, 2010) ("Plaintiffs do not assert that Bionics made misrepresentations to the FDA, and this Court concludes that the *Buckman* implied preemption analysis is limited to such claims."); *see also generally* Daniel W. Whitney, *Guide to Preemption of State-law Claims Against Class III PMA Medical Devices*, 65 Food & Drug L.J. 113, 122-23 (2010) (stating that, in light of *Riegel* and (paradoxically, since it preceded *Buckman* by five years) *Lohr*, "[s]o long as fraud-on-FDA is not alleged, the implied preemption holding of *Buckman* should have little or no application to the typical products liability action"). That is, once express preemption under § 360k(a) is in play because the cause of action addresses the safety and effectiveness of a device, implied preemption under *Buckman* is no longer a concern.

This court agrees with the majority of courts that have held that, even claims not preempted under § 360k(a) may impliedly be preempted *via* § 337(a) as construed

in *Buckman*.  The Eleventh Circuit has favored precisely this analysis in the context of the MDA, albeit prior to the Supreme Court's decision in *Riegel*:  "The existence of an express preemption clause . . . neither bars the ordinary working of conflict preemption principles nor by itself precludes a finding of implied preemption."  *This That &the Other Gift &Tobacco, Inc. v. Cobb County, Ga.*, 285 F.3d 1319, 1323 (11th Cir. 2002) (citing *Buckman*, 531 U.S. at 354).  Additionally, it is not within the province of this court's authority to disregard the language of a decision of the Supreme Court or confine it to its facts.

The view that parallel claims ostensibly permitted under *Riegel* may, nevertheless, be impliedly preempted under *Buckman* is also the better-reasoned position.  *Riegel* held that "§ 360k does not prevent a State from providing a damages remedy for claims premised on a violation of FDA regulations; the state duties in such a case parallel, rather than add to, federal requirements." 552 U.S. at 330 (citation and internal quotation marks omitted).  It makes a great deal of sense to read the "federal requirements" to which the court referred consistently with the construction of that word in § 360k(a), which the Court spent the vast majority of its opinion delineating — specifically, the device-specific requirements imposed by the PMA documentation for a Class III, PMA-approved device.  As the language defining the parallel claim exception suggests, a state could "provide" a statutory remedy for

violations of such requirements that would be neither expressly preempted, because parallel to those requirements, nor impliedly preempted, because arising under the state statute rather than the federal regulations. *See, e.g.*, *In re Medtronic, Inc., Sprint Fidelis Leads Products Liability Litigation*, 623 F.3d at 1207 (affirming dismissal of claims where "Plaintiffs simply failed to adequately plead that Medtronic *violated a federal requirement specific to the FDA's PMA approval of this Class III device*") (emphasis supplied).  This also would be consistent with the Supreme Court's reasoning in *Riegel* "that tort law, applied by juries . . . is less deserving of preservation" because  "[a] state statute, or a regulation adopted by a state agency, could at least be expected to apply cost-benefit analysis similar to that applied by the experts at the FDA."  552 U.S. at 325.

Similarly, there are undoubtedly numerous instances in which failure to adhere to the device specific "design specifications, manufacturing processes, [and] labeling requirements," *Riegel*, 552 U.S. at 319, exactingly outlined in the PMA for a device "would give rise to liability under state law even if the FDCA had never been enacted." *Riley*, 625 F. Supp. 2d at 777.  A common-law suit premised on violation of device-specific PMA requirements would not interfere with FDA regulatory objectives because the FDA already struck a balance with respect to that particular device in setting those requirements.  *E.g.*, *Rollins v. St. Jude Medical*, 583 F. Supp.

38

2d 790, 799-800 (W.D. La. 2008) (permitting claim to proceed where it was alleged that the Class III device manufacturer failed to comply with the device's specific PMA requirements); *cf. Buckman Co.*, 531 U.S. at 349 (explaining that "flexibility is a critical component of the statutory and regulatory framework under which the FDA pursues difficult (and often competing) objectives" and that maintaining that flexibility is crucial to the implied preemption the Court outlined).

By contrast, tort claims seeking to hold a manufacturer liable for producing a device determined "adulterated" within the meaning of the FDCA simply by reason of noncompliance with the technical, administrative details of the FDA's complex regulatory scheme would not give rise to such tort liability if the FDCA or the regulatory regime created pursuant to it had never existed.  These claims would be impliedly preempted under *Buckman*.  *Id.* at 353 (indicating that claims that exist "solely from the violation of FDCA requirements" are impliedly preempted)*; Parker v. Stryker Corp.*, 584 F. Supp. 2d 1298, 1301 (D. Colo. 2008) ("[P]laintiff nevertheless cannot escape preemption [simply] by reference to provisions of the FDCA that govern the sale of adulterated and misbranded devices because there is no private right of action under the FDCA.").

Plaintiff's purported parallel claims are of this third variety that would be impliedly preempted even if they were not explicitly preempted.  The only regulations

identified in the FDA warning letter to which plaintiff cites are violations of the FDA Current Good Manufacturing Practices ("CGMPs").  21 C.F.R. § 820.  These, however, constitute "an umbrella quality system providing general objectives for all device manufacturers," not requirements specific to the device at issue.  *In re Medtronic, Inc., Sprint Fidelis Leads Product Liability Litigation*, 623 F.3d at 1206 (internal quotation marks and citation omitted).  They direct "a manufacturer's [internal] organization and personnel, buildings, equipment, component controls, production and process controls, packaging and labeling controls, holding, distribution, installation, device evaluation, and recordkeeping."  *Lohr*, 518 U.S. at 513-54 (O'Connor, J., concurring in part and dissenting in part).  They are "not requirements specific to the device in question[, but] reflect[] 'entirely generic concerns about device regulation generally.'"  *Riegel*, 552 U.S. at 322 (quoting *Lohr*, 518 U.S. at 501).  In the vast majority of, and possibly all, instances and certainly as relevant to all of the regulations described here, these requirements impose precisely the type of duties the *Buckman* court held private litigants were precluded from enforcing:  duties manufacturers are subject to only because of the existence of the FDA, and that would not independently give rise to liability under the common law.

Further, as noted above, the "Reason for Recall" specifically identified in the FDA description cited by plaintiff was that "[s]ome of the parts tested exceeded

[defendant's] internal acceptance criteria for manufacturing residuals."  However, plaintiff has pointed this court to no authority under Alabama law (and this court's independent investigation has disclosed none) that indicates that noncompliance with regulations governing internal manufacturing and monitoring protocols would give rise to a cause of action that would exist independent of the regulations that made those protocols mandatory.  Permitting private individuals to penalize device manufacturers through "parallel claim" suits based upon technical violations of those administrative requirements would destroy the "flexibility [that] is a critical component of the statutory and regulatory framework under which the FDA pursues difficult (and often competing) objectives."  *Id.* at 349 (alteration added).

Accordingly, plaintiff has not adequately stated a viable state-law claim that parallels the federal regulations to which the Trident System he received was subject. Since all of his state law claims are otherwise preempted, summary judgment is due to be granted.

## IV. CONCLUSION AND ORDER

"We are taught that for every wrong there is a remedy . . . ." *Stringer v. Young's Lessee*, 28 U.S. (3 Pet.) 320, 330 (1830).  Indeed, as Justice Edward Douglass White observed more than a century ago, "the maxim, '*Ubi jus, ibi remedium*' [where law prevails, there is a remedy], lies at the very foundation of all

systems of law . . . ."  *United States v. Loughrey*, 172 U.S. 206, 232 (1898) (White, J., dissenting) (bracketed alteration added).  Thus, at common law, the injured could take comfort in knowing that "the courts are open, and the accepted maxim in those tribunals is that, where there is a wrong, there is a remedy."  *Angle v. Chicago, Saint Paul, Minneapolis & Omaha Railway Co.*, 151 U.S. 1, 21 (1894).

Yet, here, the acts of Congress, as construed by the Supreme Court, have left virtually no remedy for wrongs done to individuals by the very devices that are supposed to ease their maladies.  As a consequence of the Medical Device Amendments of 1976, "the federal courts are . . . confronted with sympathetic plaintiffs who are, nevertheless, without remedy by operation of law."  *In re Medtronic, Inc., Sprint Fidelis Leads Products Liability Litigation*, 592 F. Supp. 2d 1147, 1166 (D. Minn. 2009), *aff'd* 623 F.3d 1200 (8th Cir. 2010).

The plaintiff in the present action is an example of this legal anomaly.  He asserts claims for which this court "simply cannot provide a remedy"; ultimately, therefore, his remedy, if any, must lie "with Congress, and not with this Court (or any other court)."  *Id.* at 1166.  Such an abrogation of the right to seek redress for an alleged wrong in a court of law is all the more troubling to this judicial officer because, as explained in note 26 *supra*, it is possible that the undersigned may, at some point, have reason to question the integrity of a Class III medical device.

42

Nevertheless, as much as this judicial officer may disagree with the conclusion, this court is constrained by oath to abide by both the acts of Congress and precedential interpretations of those statutes by the Supreme Court.

In light of the binding authorities discussed in the body of this memorandum opinion, therefore, defendant's motion for summary judgment is due to be, and the same hereby is, GRANTED, and all of plaintiff's state-law claims are DISMISSED with prejudice.  Costs are taxed to the party who or which incurred them.  The Clerk is directed to close this file.

DONE and ORDERED this 14th day of December, 2010.

United States District Judge

43